UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Pure Barnyard, Inc.

    v.                            Civil No. 08-cv-501-JL
                                         Opinion No. 2011 DNH 035

Organic Laboratories, Inc.
and Results Capital, Inc.

## OPINION AND ORDER

This case arises out of a failed deal to merge two companies in the fertilizer market, plaintiff Pure Barnyard, Inc. and defendant Organic Laboratories, Inc. ("Organic Labs"), into a third entity, Organic Labs Holdings, Inc. ("Organic Holdings"). Pure Barnyard alleges that, during discussions over the proposed deal, Organic Labs--acting through its alleged agents, including defendant Results Capital, Inc.--misrepresented the quantity of fertilizer material to be provided under an agreement between Organic Holdings and a supplier. Pure Barnyard further alleges that, in reliance on these misrepresentations, it committed to selling that material (instead of its own products) to its customers, causing it a variety of commercial damage when the material turned out to be unavailable.

This court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity), because Pure Barnyard is a New Hampshire corporation and the defendants are Florida

corporations.  Organic Labs has moved for summary judgment,[1] see Fed. R. Civ. P. 56, arguing that (1) there is no evidence to show an agency relationship between it and the sources of the alleged misrepresentations, and (2) any misrepresentations were "corrected" before Pure Barnyard acted in reliance on them.[2] Organic Labs has also moved to strike certain documents submitted by Pure Barnyard with its summary judgment objection, arguing that they should have been produced in discovery but were not.

Following oral argument, Organic Labs' motion for summary judgment is denied except as to count 1, which is unconnected to the alleged misrepresentations and on which Pure Barnyard concedes summary judgment should enter.  First, there is

---

[1]Results Capital, which was just defaulted for failing to have new counsel appear on its behalf after its latest (and fourth) set of attorneys withdrew, did not join in Organic Labs' motion or file a summary judgment motion of its own.

[2]Organic Labs also argued that Pure Barnyard could not recover any of its claimed damages without expert testimony, which had not been properly disclosed, and, on that same basis moved to strike from the record an "expert witness report" by Pure Barnyard's chief executive officer, John Packard.  In a later conference call with the court, however, Pure Barnyard agreed to make Packard available for deposition before trial and to allow Organic Labs the chance to designate a damages expert, even though the deadlines for doing those things expired more than three months ago.  At oral argument, Organic Labs agreed that, in light of these accommodations, it was withdrawing its argument for summary judgment based on Pure Barnyard's lack of a properly disclosed damages expert.

sufficient evidence for a rational factfinder to conclude that at least one of the sources of the alleged misrepresentations made them while acting as Organic Labs' agent.  Second, there are factual disputes as to whether Pure Barnyard acted in reliance on the alleged misrepresentations before Organic Labs "corrected" them.  Because, in reaching these conclusions, the court has not relied on any of the materials challenged by Organic Labs' motion to strike, that motion is denied as moot.[3]

## I.   **Applicable legal standard**

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  Under this rule, "[o]nce the moving party avers an absence of evidence to support the non-moving party's case, the non-moving party must offer 'definite, competent evidence to rebut the motion.'"  Meuser v. Fed. Express

---

[3]The court also denies Organic Labs' motion to strike Pure Barnyard's surreply memorandum for exceeding the page limit set by L.R. 7.1(e)(3).  While the better practice would have been for Pure Barnyard to seek leave of court before filing an overlong memorandum, Organic Labs has not claimed any prejudice from the excess pages and, in any event, Organic Labs was given the fullest opportunity to make whatever points it wished at oral argument on its summary judgment motion.

Corp., 564 F.3d 507, 515 (1st Cir. 2009) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)).

In ruling on a motion for summary judgment, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003). The following facts are set forth accordingly, though the court has made an effort to note Organic Labs' version of events where appropriate.

## II.  **Background**

## A.  **The underlying facts**

Pure Barnyard, based in Portsmouth, New Hampshire, had been a leader in the organic lawn and garden fertilizer market, selling to a number of national hardware chains and similar retailers.  John Packard, its founder, serves as its chairman and chief executive officer.  Organic Labs, based in Stuart, Florida, is also engaged in the business of manufacturing, distributing, and selling fertilizers and other garden and lawn care products. Organic Labs is owned by David Keen, who also serves as its president, and Keen's wife.  Also involved were David Webb, the chief executive officer and majority owner of Results Capital, a

private equity firm based in West Palm Beach, Florida, and Mark
Conboy, an "entrepreneur" from that area.

In February 2008, Conboy, who had known Webb for nearly 15
years, introduced him to Keen, who wanted to sell his and his
wife's shares in Organic Labs and no longer have responsibility
for the company's day-to-day operations.  The nature of the
resulting relationship is a matter of dispute.  Conboy says that,
as he recommended to Keen, Organic Labs "retained Webb and
Results Capital to market Organic [Labs] for sale to a group of
investors," while Keen says that neither he nor Organic Labs ever
"authorized" Results Capital, Webb, or Conboy to "act as [an]
agent."  Webb agrees with Keen that "neither the Keens nor
Organic [Labs] ever retained [him] or Results Capital as their
investment banking firm, or in any other capacity."  Instead,
Webb explains, he personally "became interested in creating an
opportunity consistent with . . . Keen's stated desire to get out
of the day-to-day operation" of Organic Labs.

Webb and Conboy also disagree over how Pure Barnyard became
involved in their plan for Organic Labs.  Webb says that he
"learned about" Pure Barnyard through research into the organic
fertilizer industry that he conducted after meeting with Keen and
that, as a result, Results Capital began "working toward a
proposed vertical integration of both Organic [Labs] and Pure

Barnyard that was entirely of [Webb's] own conception."  Conboy, however, says that, "[a]cting on behalf of" both Results Capital and Organic Labs, he "began to assist" Results Capital in its "efforts to find investors," and came to learn of Pure Barnyard from the former president of a bank that did business with it.

In June or July 2008, Webb, Conboy, and Keen--joined by Michael Williams, Organic Labs' vice president of sales and marketing--called Packard and "proposed a purchase of Pure Barnyard" through Organic Holdings.[4]  As Packard recalls the terms of the proposal, "Webb, Conboy, and Keen would form [that] entity to purchase the assets" of both Organic Labs and Pure Barnyard with capital raised through the sale of stock in Organic Holdings, "in which Keen would be a shareholder."  Packard says he understood that "Keen would be a founder and co-owner with Webb and Conboy" in Organic Holdings.  When Organic Holdings was formed, however, its only shareholders were Webb and Conboy--but Keen and his wife would have received $570,000 worth of stock in

---

[4]Williams recalls that he "participated in the effort to sell Organic Labs," including by giving Webb and Conboy information at Keen's request, and that Keen and Organic Labs "allowed, encouraged, and permitted [Organic] Holdings, Results [Capital], Webb and Conboy to act on their behalf."

the company as the result of the asset purchase agreement between Organic Labs and Organic Holdings.[5]

Packard further recalls that Webb and Conboy later "made a series of representations" to encourage him to commit Pure Barnyard to the proposed transaction.  Chief among them was that Organic Labs "had a firm contract" to buy from Cargill--which Packard knew as "one of the biggest, if not the biggest chicken processor in the United States"--60,000 tons of "feather meal based material at a price no greater than $200" per ton, as well as "North American distribution rights" for this material. Packard explains that chicken feather meal is high in nitrogen, "which makes it an ideal, but historically expensive base for organic fertilizer."  Thus, Packard says, Organic Labs' right to purchase 60,000 tons of the feather meal at only $200 each "was critically important because it made organic fertilizer products cost-competitive" with their non-organic alternatives.

Neither Webb nor Conboy has denied making this statement to Packard.  Conboy, in fact, says that he "advised Pure Barnyard of the Cargill contract" based on what Keen had told him, i.e.,

---

[5]One version of this agreement, dated August 29, 2008, was notarized on September 9, 2008, and another version was notarized on October 7, 2008.  Both versions, however, provided that the Keens would receive $570,000 in Organic Holdings stock as part of the purchase price, and there is evidence that Keen, Webb, and Conboy had discussed that provision as early as August 8, 2008.

"that Organic [Labs] had a binding supply agreement with Cargill that obligated [it] to sell Organic [Labs] 60,000 tons of its new poultry feather, organic fertilizer during 2009" (capitalization corrected).  Packard recalls that, in meetings in July and August 2008, Keen "assured [him] that Cargill had developed a method or process that made the processing of feather meal easier and cheaper" and that this "new process explained the $200 [per ton] cost."  Packard says that Keen even showed him a sample of the feather meal.  Keen has not denied any of this on the record.[6]

There is some dispute, though, as to when Webb and Conboy made the representation at issue.  Consistent with the allegations of Pure Barnyard's first amended complaint, Conboy says that the representation occurred when he and Webb "telephoned Packard and the other Pure Barnyard [d]irectors to convince them to authorize Packard to enter into an asset

---

[6]At oral argument, Organic Labs explained that, while its position is that the alleged misrepresentations were not even made, it did not submit any evidence to that effect for fear of creating a dispute of material fact that would undermine its summary judgment motion.  This is difficult to understand, since the motion assumes that the misrepresentations were made, but argues that makes no difference due to the lack of evidence that there was an agency relationship with Webb and Conboy or reliance by Pure Barnyard.  A dispute over whether the misrepresentations were made, then, would have had no effect on the outcome of summary judgment.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) ("a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and summary judgment appropriate).

purchase agreement" with Organic Holdings in "July/August 2008."
Packard's affidavit says that the representation occurred in July
2008, though it does not reference the other directors' presence
on the call.  But Webb says that the "conference call where the
proposed acquisition of Pure Barnyard by [Organic] Holdings was
discussed with the Pure Barnyard Board of Directors" took place
on September 11, 2008 (without describing the substance of the
call).  Finally, an email from Packard to Webb and Conboy refers
to a Pure Barnyard board meeting, to take place on August 25,
2008, "to discuss a possible merger with Organic Labs."

The timing of the representation is potentially important
because Pure Barnyard subsequently learned that it was untrue,
i.e., that Cargill had not in fact agreed to provide Organic Labs
with 60,000 tons of the feather meal.  There is evidence that, on
or around September 19, 2008, Keen told Packard "there will only
be 750 tons available for the retail market in 2009."[7]  Then, on

---

[7]The evidence of what Keen told Packard around this time is
an email from Conboy to Webb describing a prior conversation
between Conboy and Packard.  The email itself, then, is likely
inadmissible hearsay, even if offered to prove Packard's
awareness of what Keen told him (because the email is an out-of-
court statement by Conboy).  See Fed. R. Evid. 801(c), 802; but
see James M. Rosenbaum, "In Defense of Rule 808, Federal Rules of
Evidence," 12 Green Bag 165, 166 (2009) (facetiously proposing
that "if it's an email, it may be admitted," despite hearsay or
other evidentiary problems).  Yet without any objection from Pure
Barnyard, the court will consider the email for that purpose.
See Perez v. Volvo Car Corp., 247 F.3d 303, 315 (1st Cir. 2001).

October 1, 2008, Keen informed Packard of Cargill's production schedule for the next four months, which called for "a minimum of 60 tons per month" of feather meal throughout 2009.  Packard responded, by email, "This is not good!" because the schedule "obviously puts us out of the [retail] chains and independents for 2009 and likely 2010."

Packard explains that, based on the initial representation about Cargill's contract to supply Organic Labs with the product, Pure Barnyard had "reached an agreement" to provide Home Depot and other "big box" retailers with the new feather meal product instead of Pure Barnyard's own products.  Pure Barnyard also convinced the retailers to change the layout of their shelving to accommodate the new product, and ordered packaging for it. Packard maintains that he took these actions before Keen told him that Cargill could not in fact provide the stated quantity of feather meal material, and that, by the time he learned the truth, "Pure Barnyard had already taken itself out of the 2009 market" for its own products.

There is some evidence, largely in the form of contemporaneous emails from Packard to Conboy, suggesting that Pure Barnyard had not in fact agreed to sell the feather meal product to its customers or ordered the packaging for it until at

least late September 2008.[8]  But Packard explains that, insofar
as these imply that Pure Barnyard had not yet committed itself to
selling the product, they were just "threatening innuendos
intended to push [the merger] to completion," rather than an
accurate account of the status of its business dealings.

 Pure Barnyard alleges that, as a further consequence of the
misrepresentations about Organic Labs's arrangements with
Cargill, Pure Barnyard's board of directors authorized it to
enter into an asset purchase agreement with Organic Holdings.
There is no question, though, that Pure Barnyard knew that
representation was false by the time it claims to have actually

---

 [8]Organic Labs points to four emails.  One is the email from
Webb from Conboy discussing his conversation with Packard about a
conversation he had with Keen around September 19, 2010.  See
note 7, supra.  After reporting that Keen had told Packard about
the limited quantity of feather meal product available, and
noting that it was "substantially less than the 12,000 tons
[Packard] said they could sell to retail in 2009," Conboy adds
that Packard "is OK with this, better to know the truth than to
over promise and not be able to deliver the boxes."  The second
is a September 2, 2008 email from Packard that seems to announce
Pure Barnyard's decision to present its own product at an
upcoming trade show, while noting that "[w]e may be showing other
product from [Organic Labs] if we can fast forward our merger
discussions."  The third is a September 17, 2008 email to Webb
and Conboy from Packard stating that he has "bought until next
week to give [Pure Barnyard's] customers a complete analysis of
what we're doing for 2009.  If I don't have anything from Organic
Labs, I will have to go with our original blended product.  I
will be committing to my bag manufacturer on [September 19, 2008]
for 2009-2010."  The fourth is a September 20, 2008 email to
Conboy from Packard saying that he "will be ordering bags on
[September 22].  Hopefully, they're yours."

signed the asset purchase agreement, on October 8, 2010.[9]
Furthermore, the asset purchase was never consummated--because,
Conboy explains, Keen told Webb "to call the Pure Barnyard part
of the transaction off."  Ultimately, the asset purchase between
Organic Labs and Organic Holdings was not consummated either.

**B.   Procedural history**

In late November 2008, Pure Barnyard commenced this action
against Organic Labs and Results Capital in Rockingham County
Superior Court.  The defendants removed the case to this court,
see 28 U.S.C. § 1441, and moved to dismiss for lack of personal
jurisdiction, see Fed. R. Civ. P. 12(b)(2).  Following a hearing,
the court denied the motion, based largely on Conboy's account of
his and Webb's phone call to Packard, while he was in New
Hampshire, during which the alleged misrepresentations were made.
Order of Sept. 11, 2009.

Pure Barnyard later filed a first amended complaint in six
separately numbered counts:

---

[9]Pure Barnyard has not submitted a version of the asset
purchase agreement signed by either party, though Conboy claims
to have seen Packard sign it on Pure Barnyard's behalf and hand
it to Webb.  And there is no evidence that Organic Holdings ever
manifested its assent to the agreement.  This dispute is
immaterial, though, because Pure Barnyard's claims do not arise
out the asset purchase agreement between it and Organic Holdings
(which is not even a party here).

• "interference with contractual relations," arising out of the defendants' allegedly contacting Pure Barnyard's employees "to induce them to leave and come work for Organic Labs" (count 1);

• civil conspiracy, arising out of the defendants' use of the alleged misrepresentations as part of a plan "to maximize the amount of money which they could take from" merging Organic Labs and Pure Barnyard into Organic Holdings (count 2);

• fraud, based largely on the alleged misrepresentation as to Organic Labs' arrangement with Cargill (count 3);

• negligent misrepresentation, based largely on the same alleged statement (count 4);

• violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A, based on the same alleged misrepresentation (count 5); and

• a "common-law claim for attorneys' fees, costs, and expenses" (count 6).

Organic Labs then moved to dismiss counts 2, 3, 5, and 6 for failure to state a claim for relief. See Fed. R. Civ. P. 12(b)(6). Organic Labs argued, among other things, that Pure Barnyard had not alleged any fraudulent misrepresentation "by Organic Labs or any of its principals," but only by Webb. The court ruled, however, that Pure Barnyard had plausibly alleged an agency relationship between Webb and Conboy, on one hand, and Organic Labs, on the other. The court therefore denied the motion to dismiss except as to count 6 (the common-law claim for attorneys' fees). Order of Aug. 10, 2010. The case has since been scheduled for a bench trial.

13

III. **Analysis**

In moving for summary judgment on counts 2-5 (civil conspiracy, fraud, negligent misrepresentation, and violation of N.H. Rev. Stat. Ann. § 358-A), Organic Labs makes two independent arguments:  (A) there is insufficient evidence for a rational factfinder to conclude that Webb and Conboy were acting as its agents when they made the alleged misrepresentations, and (B) the alleged misrepresentations were "corrected" before Pure Barnyard acted in reliance on them.[10]  The court will address these arguments in turn.


A.   **Agency**

Under New Hampshire law, "the necessary factual elements to establish agency involve:  (1) authorization from the principal that the agent shall act for him or her; (2) the agent's consent to so act; and (3) the understanding that the principal is to exert some control over the agent's actions."  VanDeMark v.

---

[10]Organic Labs also moves for summary judgment on count 1 (arising out of its alleged efforts to lure away Pure Barnyard's employees) because, among other reasons, none of those employees actually went to work for Organic Labs.  Pure Barnyard concedes in its surreply that, on this basis, summary judgment should enter against it on count 1.

McDonald's Corp., 153 N.H. 753, 760-61 (2006).[11]  Organic Labs
argues that Pure Barnyard cannot satisfy this test because it has
no evidence of the requisite "authorization" from Organic Labs
that Webb and Conboy act on its behalf.

In one of his affidavits submitted here, however, Conboy
attests that Organic Labs "retained Webb and Results Capital to
market Organic [Labs] for sale to a group of investors."  Organic
Labs does not question that, if it did in fact retain Webb to try
to sell the company, then that would amount to the authorization
necessary to make Webb the agent of Organic Labs for that
purpose.  Instead, Organic Labs argues that, because "none of the
documents . . . produced by [Pure Barnyard] in discovery even
remotely demonstrates that Keen ever authorized" Webb, he "could
not have acted as an agent of Organic Labs."  But a principal
need not authorize its agent in writing.  "The granting of actual
authority may be either express or implied from the parties'
conduct or other evidence of intent."  Dent v. Exeter Hosp.,
Inc., 155 N.H. 787, 792 (2007).

---

[11]The parties' summary judgment briefing relies solely on
New Hampshire law in addressing the agency issue.  The court
takes that as a tacit agreement that New Hampshire law controls
that question here, see, e.g., Anderson v. Century Prods. Co.,
943 F. Supp. 137, 150 n.2 (D.N.H. 1996), despite Florida's
substantial relationship to the underlying events, cf. Demers v.
Pilkington N. Am., Inc., 2010 DNH 193, 9 n.3.

Organic Labs also complains (as it does about much of Conboy's affidavit) that his statement that the company "retained Webb and Results Capital to market Organic [Labs] for sale to a group of investors" is merely "conclusory" and therefore insufficient to create a genuine issue of fact.[12]  It is true that "[a] properly supported motion for summary judgment cannot be defeated by relying upon conclusory allegations." Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010).  But Conboy offers more than just the conclusion that Organic Labs retained Results Capital; he also describes the surrounding facts in some detail.

As discussed in Part II.A, supra, Conboy attests that, after learning that Keen wanted to sell his company, Conboy introduced Keen to Webb, and recommended that Keen retain Webb's firm, Results Capital, for that purpose.  Conboy says that he and Webb then undertook "efforts to find investors" toward that end,

---

[12]It could be argued that Conboy's affidavit fails to show the basis of his personal knowledge that Organic Labs "retained" Results Capital, see Fed. R. Evid. 602, and that his statement to that effect is therefore inadmissible on summary judgment, see Fed. R. Civ. P. 56(c)(4).  But the closest Organic Labs comes to making this argument is a footnote in its summary judgment memorandum pointing out that Conboy "was not employed in any capacity by Results Capital" and calling his statement "unsupported."  That is insufficient.  See Perez, 247 F.3d at 314.  It is also worth noting that Williams--who was employed by Organic Labs--says in his affidavit that Organic Labs "allowed, encouraged, and permitted . . . Webb and Conboy to act on [its] behalf."  See note 4, supra.

eventually leading to Pure Barnyard.  Conboy also recalls that both Keen and another Organic Labs employee, Williams, joined Webb and Conboy in calling Packard to propose the sale of Pure Barnyard to Organic Holdings.  Finally, Conboy says that the deal was halted at Keen's request.

Thus, Conboy's account--though disputed not only by Keen but by Webb, who insists that Results Capital was working strictly on its own behalf[13]--has "substance in the sense that it limns differing versions of the truth which a factfinder must resolve," making summary judgment inappropriate. Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995) (quotation marks and ellipse omitted).  Indeed, his account bears little resemblance to the kinds of "conclusory" statements which the court of appeals typically deems ineffectual on summary judgment. See, e.g., Rios-Jimenez v. Principi, 520 F.3d 31, 42 n.7 (1st Cir. 2008) (finding witness's statements that plaintiff was "qualified" to perform her job, "without any explanation or

---

[13]Organic Labs argues that Webb's account "is inherently reliable because it is akin to a statement against interest," since Webb's firm, Results Capital, would be solely liable for his alleged misrepresentation if he had not been acting on Organic Labs' behalf.  While this argument may ultimately have some merit, "credibility determinations are for the factfinder at trial, not for the court at summary judgment." Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 49 (1st Cir. 1999).

reference to evidence," insufficient to avoid summary judgment on that issue); Sanchez v. Triple S Mgmt. Corp., 492 F.3d 1, 11 n.11 (1st Cir. 2007) (finding witnesses' statements that defendants acted "in furtherance of a scheme" insufficient to avoid summary judgment on that issue, given a "complete lack of specificity").

Conboy's testimony that Organic Labs "retained" Webb, then, suffices to create a triable issue of fact as to whether the company authorized him to act on its behalf so as to make him its agent.  In light of this ruling--together with the evidence that it was Webb, either alone or in addition to Conboy, who made the allegedly fraudulent representations--the court need not address the thrust of Organic Labs' agency argument, which is that there is no evidence that Conboy was acting as its agent.  The court also need not address Pure Barnyard's principal responses, which are that proof of the alleged agency relationship is inessential in light of Keen's own statements to Packard about the Cargill material, and that, even if Webb and Conboy lacked actual authority, they acted with apparent authority.  If necessary, those arguments can be addressed in connection with trial in this matter, where the court will sit as the finder of fact.

**B.   Reliance**

Organic Labs also argues that, even if Webb or Conboy were acting as its agents when they allegedly told Packard that it had a contract with Cargill for 60,000 tons of the feather meal, Pure Barnyard still cannot recover on any of its claims because the alleged misrepresentation was "corrected" before Pure Barnyard acted in reliance on it.  As Organic Labs points out, Pure Barnyard can recover under its fraudulent or negligent misrepresentation theories only for "'pecuniary loss caused to [it] by [its] justifiable reliance upon the misrepresentation.'" Gray v. First NH Banks, 138 N.H. 279, 283 (1994) (quoting Restatement (Second) of Torts § 525 (1976)).[14]

----

[14]Organic Labs argues that the same limitation applies to Pure Barnyard's Consumer Protection Act claim, relying on the statutory language that "[a]ny person injured by another's use of any method, act or practice declared unlawful under this chapter may bring an action." N.H. Rev. Stat. Ann. § 358-A:10, I.  This provision goes on to state, however, that "recovery shall be in the amount of actual damages or $1,000, whichever is greater," id., and the New Hampshire Supreme Court has ruled that this section "does not require a showing of actual damages for a claimant to be awarded the statutory minimum and attorney's fees" (which the statute also authorizes). Beckstead v. Nadeau, 155 N.H. 615, 620 (2007).  On this basis, in fact, the court in Beckstead reversed a directed verdict against the plaintiffs on their § 358-A claim, which the Superior Court had entered because "they didn't lose anything as a result of the deceptive acts they claimed." Id. at 620-21.  Nevertheless, this court will assume for purposes of the summary judgment motion that Pure Barnyard cannot prevail on its § 358-A claim without proving that the alleged misrepresentation caused injury to it.

Organic Labs argues that, because Packard knew that Cargill had not in fact agreed to provide Organic Labs with 60,000 tons of the feather meal before he signed the asset purchase agreement on behalf of Pure Barnyard, he could not have done so in reliance on the alleged misrepresentation.  That is correct.  But Packard says that he also caused Pure Barnyard to take other acts in reliance on the alleged misrepresentation, i.e., entering agreements to supply its customers with (and buying packaging for) the feather meal product, rather than Pure Barnyard's own product line.  As discussed in Part II.A, supra, there are a number of factual disputes going to whether those acts occurred before Packard learned the truth about Cargill's feather meal.

First, there is conflicting evidence as to when the alleged misrepresentation was made:  Packard says it was July 2008, Conboy says it was "July/August 2008," a contemporaneous email from Packard suggests that it was August 25, 2008, and Webb says (without admitting or denying that he made the misrepresentation) that it was September 11, 2008.  Second, there is conflicting evidence as to when Packard first learned the alleged misrepresentation was false:  emails suggest that it was either September 18, 2008, or October 1, 2008.  Third, there is conflicting evidence as to when (and perhaps even whether) Pure Barnyard agreed to supply the feather meal product to its

20

customers and ordered the bags for it:  Packard maintains that it was before he learned the truth, but contemporaneous emails suggest it was not until later (if at all), <u>see</u> note 7, <u>supra</u>.

Resolving all--or even some--of these disputes in Pure Barnyard's favor, a rational factfinder could conclude that Pure Barnyard acted in reliance on the alleged misrepresentation before learning that it was false.  So Organic Labs is not entitled to summary judgment on the ground that Pure Barnyard cannot prove detrimental reliance.

At oral argument, Organic Labs maintained that, even if Pure Barnyard did act in reliance on the alleged misrepresentation before it was corrected--by committing to sell the feather meal product, instead of Pure Barnyard's existing products, to its customers, and the like--that reliance was not justifiable in light of the fact that the asset purchase agreement between Pure Barnyard and Organic Holdings was not yet in place.  Out of fairness, this court does not ordinarily consider points mentioned for the first time at oral argument.  <u>See</u>, <u>e.g.</u>, <u>Doe v. Friendfinder Network, Inc.</u>, 540 F. Supp. 2d 288, 304 n.19 (D.N.H. 2008).  The court sees no reason for an exception here simply because, just before oral argument, Organic Labs received a transcript of the September 11, 2008 conference call between Webb

and Conboy, on one hand, and Packard and the other Pure Barnyard board members, on the other.

First, counsel for Organic Labs candidly acknowledged that, while they had only recently received a transcript of the call, they had been in possession of a tape recording of it for at least a year.  This is not a case, then, where the non-moving party failed to turn over discoverable evidence in time for the moving party to incorporate it into its summary judgment presentation.  Second, Organic Labs could have made its new justifiable reliance argument without the transcript:  while Packard did state during the call that Pure Barnyard had yet to commit itself to the merger at that point, the other evidence of record is largely to the same effect.  See notes 8-9, supra. Indeed, Organic Labs argued exactly that point in its reply memorandum (which was filed before it had the transcript)--albeit in support of its argument that Pure Barnyard could not have acted in reliance on the alleged misrepresentation when it committed to the merger, rather than its new argument that nothing Pure Barnyard did in reliance on the alleged misrepresentation before it committed to the merger could have been justifiable.  This new argument, then, will have to await consideration at trial.

**IV.   <u>Conclusion</u>**

For the foregoing reasons, Organic Labs' motion for summary judgment[15] is DENIED except as to count 1, as to which it is GRANTED by assent; Organic Labs' motion to strike[16] is DENIED as moot; and Organic Labs' motion to strike the surreply[17] is DENIED.


**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  March 7, 2011

cc:  Mark F. Weaver, Esq.
     William S. Gannon, Esq.
     Robert H. Miller, Esq.
     Christopher Cole, Esq.
     Courtney H.G. Herz, Esq.
     Results Capital Group, Inc.

---

[15]document no. 65.

[16]document no. 77.

[17]document no. 86.