UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Pure Barnyard, Inc.

    v.                          Civil No. 08-cv-501-JL
                                Opinion No. 2012 DNH 171
Organic Laboratories, Inc.
and Results Capital, Inc.


**MEMORANDUM ORDER**

This case arises out of a failed deal to merge two companies
in the fertilizer market, plaintiff Pure Barnyard, Inc. and
defendant Organic Laboratories, Inc. ("Organic Labs"), into a
third entity, Organic Labs Holdings, Inc. ("Organic Holdings").
Pure Barnyard alleges that, during discussions over the proposed
deal, Organic Labs--acting through its alleged agents, including
defendant Results Capital, Inc.--misrepresented the quantity of
fertilizer material to be provided under an agreement between
Organic Labs and a supplier.  Pure Barnyard further alleges that,
in reliance on these misrepresentations, it committed to selling
that material (instead of its own products) to its customers,
causing it to lose sales and, ultimately, to go out of business,
when the material turned out to be unavailable.

This court has subject-matter jurisdiction under 28 U.S.C.
§ 1332(a)(1) (diversity), because Pure Barnyard is a New
Hampshire corporation with its principal place of business here

and the defendants, Results Capital and Organic Labs, are Florida corporations with their principal places of business there. After the court denied Organic Labs' motion for summary judgment, Pure Barnyard, Inc. v. Organic Labs., Inc., 2011 DNH 035, it reached a settlement of Pure Barnyard's claims against it.

On February 25, 2011, this court defaulted defendant Results Capital for failing to comply with orders directing that counsel appear on its behalf.  More than seven months later--and more than one month after the plaintiff, Pure Barnyard, Inc., had moved for a default judgment against Results, see Fed. R. Civ. P. 55(b)(2)--Results Capital moved, through counsel, to strike the entry of default, see Fed. R. Civ. P. 55(b)(2).

After an evidentiary hearing, the court denies Results Capital's motion to strike the default and grants Pure Barnyard's motion for a default judgment.  As explained fully below, Results Capital has failed to show good cause to set aside the default under Rule 55(c).  In fact, Results Capital was defaulted after it failed to make any serious effort to comply with a series of court orders that it obtain counsel--a failure that persisted for nearly eight months after the court expressed a willingness to lift the default if Results Capital could obtain counsel (which it had said it soon expected to be able to do).

But the court will enter judgment by default against Results Capital only in the sum of $79,009.01, rather than the more than $3 million that Pure Barnyard seeks.  That sum represents the entire value of Pure Barnyard as a going concern, but it has not shown that its business failed due to Results Capital's misrepresentations about the available quantity of feather material or any other subject.  Instead, as Pure Barnyard more or less acknowledges, its business failed because Organic Labs backed out of the proposed merger--and Pure Barnyard has never claimed that Results Capital's misrepresentations caused that to happen.  Pure Barnyard can, however, recover the profits it would have realized had it sold its own product to one of its customers, instead of committing to sell that customer the chicken feather product in reliance on Results Capital's misrepresentations as to its availability.

**I.   Results Capital's motion to strike the default**

**A.   Background**

Results Capital accepted service of process in this action on December 10, 2008, then filed a motion to dismiss for lack of personal jurisdiction.  See Fed. R. Civ. P. 12(b)(1).  After the court denied that motion from the bench following oral argument, Order of Sept. 11, 2009, Results Capital filed an answer to the

complaint.  These filings were made by Results Capital's counsel of record at the time, who were also then counsel of record for its co-defendant, Organic Labs (and who represented the defendants at oral argument on the motion to dismiss).

On October 20, 2009, however, these attorneys withdrew from their representation of both defendants in this matter, citing a "breakdown of the attorney-client relationship."  While neither Results Capital nor Organic Labs took issue with this statement at the time, Results Capital now explains that the withdrawal arose simply because the defendants "chose to engage separate New Hampshire counsel."  Following the withdrawal, the court ordered that new counsel appear on behalf of both defendants--which, as corporations, could not appear in this action pro se, see L.R. 83.6(d)--by November 10, 2009.  Order of Oct. 21, 2009.

After Results Capital asked for (and received) an extension of this deadline, new counsel filed a notice of appearance on its behalf on November 23, 2009, and this attorney participated in the preliminary pretrial conference the next day.  As a result of discussions at the conference, the court ordered Pure Barnyard to file an amended complaint by December 11, 2009, with answers due by January 10, 2010.  Order of Nov. 24, 2009.  The amended complaint was timely filed.  On January 7, however, counsel of record for Results Capital filed a motion to withdraw, stating

4

only that he had "determined it was necessary," together with a
motion for a one-month extension of Result's Capital's time to
answer.  The court granted both of these motions (granting the
extension over Pure Barnyard's objection), ordering that new
counsel appear for Results Capital by February 15, 2010, on pain
of default.  Orders of Jan. 26, 2010.  In the meantime, new
counsel had appeared for the other defendant, Organic Labs, and
filed a motion to dismiss certain counts of the amended complaint
for failure to state a claim, see Fed. R. Civ. P. 12(b)(6),
together with an answer to the other counts.

New counsel filed a notice of appearance for Results
Capital, together with an answer to the amended complaint and a
joinder in Organic Labs' motion to dismiss it, on February 16,
2010--a week after the extended deadline for responding to the
amended complaint.  At the close of a hearing on the defendants'
motions to dismiss the amended complaint, the court granted them
as to one count, but denied them as to the others, and ordered
the parties to file a new proposed scheduling order.  Order of
Aug. 10, 2010.  The plan was filed, but with the explanation
that, while counsel for all parties had participated in
formulating it, counsel for Results Capital had yet to obtain his
client's assent to it.  Just over one month later, counsel for
Results Capital filed a motion to withdraw, stating that

5

"representation has been rendered unreasonably difficult by the client" and "the client has not been able to substantially fulfill its obligations to counsel."  Results Capital did not take issue with these statements at the time, but now says "counsel withdrew due solely to the fact that Results Capital did not have sufficient funds to pay for this litigation."

The court granted the motion to withdraw, and, for the third time, ordered that new counsel appear on behalf of Results Capital on pain of default--this time, by November 15, 2010. Order of Oct. 18, 2010.  When that date arrived, Results Capital (acting without counsel) filed a letter with the court, stating only that it "would like to request more time in securing a law firm to represent [it]."  The court treated this as a motion for an extension of time and, receiving no objection, ordered the deadline continued until December 10, 2010, while cautioning that "[a]nother extension is not anticipated."  Order of Nov. 24, 2011.  Nevertheless, on December 9, Results Capital, through another letter, requested another extension, claiming to lack "the funds to secure a firm" because the "lawsuit has been very damaging."  In the meantime, as contemplated by the revised scheduling order, Pure Barnyard and Organic Labs had completed discovery, and Organic Labs had filed a motion for summary judgment on all claims against it.

6

On January 6, 2011, the court denied Results Capital's most recent request for an extension of time to secure counsel.  The court explained that, while it was "sensitive to [Results Capital's] plight, the motion/letter fails to provide any basis to infer or conclude that counsel will make an appearance on [its] behalf within a reasonable period of time that would justify additional extensions."  Order of Jan. 6, 2011. Subsequently, Pure Barnyard and Organic Labs completed their briefing on the summary judgment motion (and related motions to strike), the court scheduled oral argument on those motions and denied Organic Labs' motion to continue the trial, scheduled (at that point) for April 5, 2011.

In response to this ruling, Organic Labs requested a telephone conference with the court, proposing a series of available times for all counsel of record--as well as David Webb, the principal of Results Capital, who had given his assent to the request for the conference.  During the conference, on February 22, 2011, Webb stated that, as a result of some new business, he expected Results Capital's financial condition to improve so that it could afford to retain counsel in this matter.  The court explained that, while Results Capital would nevertheless be defaulted, it could seek to have the default removed if it were

in fact able to secure counsel.  A written order to that effect followed, defaulting Results Capital.  Order of Feb. 25, 2011.

On that same day, the court heard oral argument on Organic Labs' motion for summary judgment, and advised the parties from the bench that the motion would very likely be denied and that trial would commence as scheduled.  Following the written order denying the summary judgment motion, Pure Barnyard and Organic Labs jointly moved for a continuance of trial so that they could attempt to settle the case.  The court granted the motion, and, on May 13, 2011, was advised that Pure Barnyard and Organic Labs had reached a settlement.  They filed a stipulation of dismissal on August 12, 2011.

In the meantime, the court had heard nothing from Results Capital, despite its statement in the telephone conference in February that it anticipated being able to retain counsel.  So the court ordered Pure Barnyard to file a motion for a default judgment against Results Capital (which Pure Barnyard did, on August 31, 2011) and scheduled a damages hearing for September 19, 2011.  Order of Aug. 13, 2011.  On that day, new counsel filed (together with a motion to postpone the hearing) a notice of appearance on behalf of Results Capital.  This was nearly eight months after the entry of default against Results Capital, and nearly more than nine months after this court had denied

8

Results Capital's last request for more time to find counsel.

Results Capital later filed its motion to strike the entry of

default, on October 7, 2011.

**B.    Analysis**

Results Capital does not question that the court properly

entered default against it for failing to comply with the orders

directing counsel to appear on its behalf.  Instead, it argues

that "good cause" exists to set aside the entry of default under

Rule 55(c).  As the court of appeals has explained:

> There is no mechanical formula for determining whether
> good cause exists and courts may consider a host of
> relevant factors.  The three typically considered are
> (1) whether the default was willful; (2) whether
> setting it aside would prejudice the adversary; and
> (3) whether a meritorious defense is presented.  But
> that is not an exclusive list and courts may consider
> other relevant factors, including (4) the nature of the
> defendant's explanation for the default; (5) the good
> faith of the parties; (6) the amount of money involved;
> [and] (7) the timing of the motion to set aside the
> default.  Ultimately, the burden of demonstrating good
> cause lies with the party seeking to set aside the
> default.

Indigo Am., Inc. v. Big Impressions, LLC, 597 F.3d 1, 3 (1st Cir.

2010) (internal citations and quotation marks omitted).  Taking

all of these factors into consideration, this court rules that

Results Capital has failed to carry its burden to show good cause

to set the default aside.

The court acknowledges that, as Results Capital emphasizes, some of the relevant considerations favor a finding of good cause.  Pure Barnyard complains that, if the default is lifted, it will have to "endure the cost and expense of a trial" of its claims against Results Capital.  That is the normal consequence of lifting any default, however, and not the sort of "prejudice" that counsels against such relief, as the court of appeals has held.  See id.

Results Capital has also suggested a "meritorious defense," which, according to the court of appeals, "is not a particularly arduous task."  Id. at 4.  As Pure Barnyard points out, Results Capital relies on many of the same defenses that Organic Labs advanced in its unsuccessful motion for summary judgment.  The court did not reject those defenses as a matter of law, but simply identified material factual disputes necessitating a trial on those issues.  Pure Barnyard, 2011 DNH 035, 2-3.  The very existence of these disputes suffices to make out a "meritorious defense" for purposes of Rule 55(c).  See Indigo Am., 597 F.3d at 4 (holding that the defense need only be factually "cognizable" or "arguable").  Furthermore, Pure Barnyard seeks a default judgment for the sum of more than $3 million, so the amount of money involved is significant.

10

In the court's view, however, whatever weight these factors carry is substantially overcome by the other relevant considerations.  First, and most importantly, the court finds that the default was willful.  Following the withdrawal of the third different attorney to appear for Results Capital in this case, the court specifically warned it that, if new counsel did not appear by the appointed deadline, default could follow. After granting Result Capital's first request to extend that deadline, the court advised Results Capital not to expect another continuance.  Results Capital responded by requesting another continuance anyway and, after the court denied that request for failing to explain how more time could help secure counsel, failed to offer such an explanation (or, so far as the record indicates, do anything) even though default did not enter until several weeks later.

Moreover, in the conference call that immediately preceded the entry of default, Webb told the court that Results Capital expected new business that would enable it to afford counsel in this case.  Even though the court specifically invited a motion for relief from the default if this expectation was realized, Results Capital did not seek it until nine months later.  Indeed, it was not until the very day the damages hearing was scheduled that new counsel even appeared on behalf of Results Capital.

11

As the court of appeals has warned, "[u]pon proper notification of pending action parties must respond diligently, or face the concededly harsh consequences of a judgment resulting not from consideration of the merits, but from the parties' own inaction." FDIC v. Francisco Inv. Corp., 873 F.2d 474, 478 (1st Cir. 1989) (citing Shepard Claims Serv. v. William Darah & Assocs., 796 F.2d 190, 193 (6th Cir. 1986)).  Thus, a party's "reckless disregard for the effect of its conduct on [the] proceedings" is tantamount to willfulness where Rule 55(c) is concerned.  Shepard Claims Serv., 796 F.2d at 194.  The record before the court fairly supports (if not compels) a finding of "reckless disregard" on the part of Results Capital:  until it stood on the precipice of having a monetary judgment entered against it, Results Capital appears to have made no serious effort to comply with the court's orders directing--on pain of default--that counsel appear, or to avail itself of the court's invitation to secure counsel so the default could be removed.[1]

---

[1]This conclusion follows without even taking into account the fact that Results Capital found itself without counsel because three different attorneys had withdrawn from representing it--one of them citing a "breakdown of the attorney-client relationship" and another that "representation has been rendered unreasonably difficult by the client."  While Results Capital now says that each withdrawal was due either to its own choice to retain new counsel or "for the sole reason that [it] did not then have funds to pay," this begs to the question as to why a number of different lawyers would have submitted sworn statements to

The willfulness of the default weighs against a finding of good cause to set it aside.

Second, and relatedly, the nature of Results Capital's explanation for the default, the good faith of the parties, and the timing of the motion also weigh against a finding of good cause.  Results Capital has offered no explanation for its prolonged period of inaction, aside from the bald assertion that "[r]ecently, [its] business has improved," enabling it to hire new counsel.  Again, though, Results Capital told the court that business was about to pick up back in February, yet did not seek to remove the default or do anything else until the very day of the scheduled damages hearing, some eight months later, when its new counsel appeared.  It is difficult to believe that this timing was just a coincidence, i.e., that it was not until the eve of the damages hearing that Results Capital finally acquired the funds to hire new counsel--particularly in light of Results Capital's earlier statement that it expected its financial situation to improve several months earlier than that.  Results Capital has offered no explanation for the discrepancy or, for that matter, any account of its efforts to secure counsel (or the

---

this court saying otherwise.  But the court need not resolve this dispute because, again, Result Capital's willfulness relative to the default is evident solely from its inaction <u>after</u> its third attorney had withdrawn.

funds to hire counsel) since its third attorney was allowed to withdraw in October 2010. At best, then, Results Capital was indifferent to the status of these proceedings and, as just discussed, indifference is incompatible with a finding of good cause under Rule 55(c).

Indeed, as the court of appeals has held, when a defendant is "aware of the pending legal problem, but hope[s] that it '[will] all go away'" instead of "mov[ing] to rectify the situation in a timely manner," that defendant has not shown "the good faith necessary to justify the court's lifting of the default." McKinnon v. Kwong Wah Rest., 83 F.3d 498, 504 (1st Cir. 1996).[2] This conclusion holds, moreover, even when the defendant attempts to blame its inaction on its inability to afford counsel. See id. at 503-04; Perry v. Warner (In re Warner), 247 B.R. 24, 26 (1st Cir. B.A.P. 2000).

---

[2]McKinnon arose from strikingly similar facts. The defendants there had been represented by a number of different attorneys, the last of whom moved to withdraw after the defendants said they did not have the money for a retainer. 83 F.3d at 504. The court denied the defendants' request for additional time to answer the complaint and proceeded to enter default against them, but the defendants did not promptly respond to any of these developments. Id. While the defendants blamed their inaction largely on their inability to afford counsel, the district court found that they "did not act reasonably even under these circumstances," id. at 503, and the court of appeals upheld this finding, id. at 504.

As stated in the order denying Results Capital's final request to extend the deadline for counsel to appear, the court is sympathetic to a defendant that finds itself in this predicament.  But sympathy alone cannot justify prolonged delays in the progress of a case.  Courts have held that, for a party to vacate a default based on its claimed inability to afford a lawyer, it "must demonstrate that it exercised reasonable diligence in attempting to secure counsel" despite its financial straits.  Penn. Land Holdings Corp. v. Mason, No. 06-1150, 2008 WL 3246868, at *4 (W.D. Pa. Aug. 6, 2008); see also First Commercial Bank, Ltd. v. McCord, No. 94-74, 1996 WL 254334, at *4 (D. Guam May 8, 1996); Barry Howard & Assocs., Inc. v. Ind. Transp. Museum, Inc., 125 F.R.D. 487, 490 (S.D. Ind. 1989). Results Capital has not attempted to make that showing.

Results Capital also emphasizes that, as a corporation, it could not participate in this litigation until it had counsel. See L.R. 83.6(c).  But "the right to conduct business in a form that confers privileges, such as the limited personal liability of the owners for tort or contract claims against the business, carries with it obligations one of which is to hire a lawyer if you want to sue or defend on behalf of the entity." United States v. Hagerman, 545 F.3d 579, 581-82 (7th Cir. 2008) (Posner, J.).  There is no indication that Results Capital took that

15

obligation seriously here, at least until just before this court
stood poised to enter a multi-million dollar default judgment.
Because Results Capital has failed to carry its burden to show
good cause, its motion to lift the default is denied.

## II.  **Pure Barnyard's motion for default judgment**

Once default is entered, the defendant is "taken to have
conceded the truth of the factual allegations in the complaint as
establishing the grounds for liability as to which damages will
be calculated." Ortiz-Gonzalez v. Fonovisa, 277 F.3d 59, 62-63
(1st Cir. 2002) (quotation marks omitted).  Upon entry of
default, "[d]iscretion as to the judgment or the need for a
hearing on damages is vested with the district court." Id. at 64
(citing Pope v. United States, 323 U.S. 1, 12 (1944)).  Here, as
noted at the outset, the court held an evidentiary hearing on
Pure Barnyard's claimed damages at which its president and
founder, John Packard, testified and was subjected to cross-
examination by counsel for Results Capital.

## A.  **Background**

By virtue of the default, the facts alleged in Pure
Barnyard's amended complaint are "taken as true." Brockton Sav.
Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 13 (1st Cir.
1985).  The court has drawn the following relevant facts from the

amended complaint, as well as affidavits by Packard and other evidentiary materials filed at earlier stages of the litigation and Packard's testimony at the damages hearing.

Prior to the events at issue in this litigation, Pure Barnyard, based in Portsmouth, New Hampshire, was a self-described leader in the organic lawn and garden fertilizer market, selling to a number of national home improvement chains and similar retailers.  In June or July 2008, Webb (joined by others) called Packard and proposed a transaction in which Organic Holdings would purchase the assets of both Pure Barnyard and Organic Labs, with capital to be raised from the sale of stock in Organic Holdings.

In July and August 2008, Webb made a series of representations to encourage Packard to commit Pure Barnyard to the proposed transaction.  Chief among them was that Organic Labs "had a firm contract" to buy from Cargill--which Packard knew as "one of the biggest, if not the biggest chicken processor in the United States"--60,000 tons of "feather meal based material at a price no greater than $200" per ton, as well as "North American distribution rights" for this material.  Packard explains that chicken feather meal is high in nitrogen, "which makes it an ideal, but historically expensive base for organic fertilizer." Thus, Packard says, Organic Labs' right to purchase 60,000 tons

17

of the feather meal at only $200 each "was critically important because it made organic fertilizer products cost-competitive" with their non-organic alternatives.

The amended complaint states that, in reliance on these and other misrepresentations, Pure Barnyard "worked to place the [new] products . . . in various chains and outlets where [Pure Barnyard] had previously sold [its] products, and did not obtain any orders for any of its own products for the 2009 season."[3] Packard testified that Pure Barnyard reached an agreement to provide Home Depot with the new feather meal product instead of Pure Barnyard's own product, known as "Cockadoodle Doo."  At the hearing, Packard could not identify any other retailers to which Pure Barnyard had agreed to sell the new feather meal product.

---

[3]As a result of Results Capital's default, this allegation is taken as true. Brockton Sav. Bank, 771 F.2d at 13.  Thus, while other evidence in the record suggests that Pure Barnyard committed to selling the new feather meal product to Home Depot in June 2008--which was before Webb allegedly made the misrepresentations as to Organic Labs' access to that product from Cargill--Results Capital cannot now rely on that evidence to escape liability for its misrepresentation.  Again, Results Capital is "taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability as to which damages will be calculated." Ortiz-Gonzalez, 277 F.3d at 62-63.  In any event, it does not make sense, as a logical matter, that Packard would have committed selling a new product to Home Depot before he had any reason to believe the product was available, so the evidence suggesting the opposite chronology very likely reflects nothing more than confusion as to when various events unfolded.

As it turns out, the statement about Organic Labs' access to such quantities of chicken feather meal from Cargill was false. Packard learned this at some point between September 18, 2008 and October 1, 2008.  He immediately informed Home Depot and, as a result, Pure Barnyard "lost the Home Depot account."  Home Depot had sold the "Cockadoodle Doo" product for the prior two seasons, and Home Depot accounted for around 40 percent of Pure Barnyard's sales in 2007.  Though Packard offered, Home Depot refused to buy Pure Barnyard's "Cockadoodle Doo" product instead, as they had been doing for the prior two seasons.  Packard acknowledged that he did not know the basis for that decision, but he testified that he now "can't go back to Home Depot again and sell them anything" because "[t]hey have long memories."  Packard also testified that, compared to the Cargill chicken feather product, "Cockadoodle Doo" was "[t]oo expensive" and, in fact, "was always too expensive."

Packard further testified that, had Home Depot agreed to resume buying the "Cockadoodle Doo" product, Pure Barnyard could have provided it, but "[i]t would have been tight."  He explained that, although Pure Barnyard did not have enough working capital at that point to buy the packaging or materials that would have been required to fill such an order, he "would have tried to raise some funding" or tried to persuade the company's commercial

19

lender, Sovereign Bank, to allow Pure Barnyard to draw against its line of credit.  Packard stated that, although Pure Barnyard had borrowed only $535,000 of the $1 million available under the line of credit at that point, Sovereign refused to allow Pure Barnyard to borrow any more because it "could not continue its business" and its "finances couldn't support the line of credit." He explained that Pure Barnyard could not continue its business because it "had no packaging."

Packard testified that, in reliance on Webb's statement, Pure Barnyard ordered samples of packaging for the new chicken feather product, though at a "minimal" cost of less than $10,000. Packard explained that the company needed to order its packaging between 16 and 18 months in advance so that, by the time he found out the chicken feather product was in fact unavailable, it was too late to order new packaging for the 2008 selling season.

Packard places the value of Pure Barnyard at between $3 million and $4 million as of mid-2008.  The company's unaudited profit and loss statement for the first six months of that year (the only period for which such a statement has been provided) show sales of $760,025.69, at a cost of $575,754.04.  Those sales figures includes fertilizer sales of $386,254.27 ($14,400 of that figure represented sales to commercial customers, rather than consumers) at a cost of $183,981.74.  Nevertheless, Pure

20

Barnyard's net income for this period was just $15,213.09, due in part to $51,836.48 in interest charges.  Pure Barnyard had greatly reduced sales after 2008:  approximately $60,000 in each of 2009 and 2010, and $20,000 in 2011.  So, Packard says, Pure Barnyard is "effectively . . . out of its retail business."

Packard testified that Pure Barnyard failed because it had run out of money--and that this occurred because the company "believed that the Results Capital/Organic Labs thing was real and it provided funding."  Pure Barnyard alleges that, in reliance on these and other misstatements, its board of directors authorized it to enter into the proposed asset purchase agreement with Organic Holdings.  But the asset purchase was never consummated, and Pure Barnyard has not brought any claim in this action against Results Capital or anyone else arising out of the non-performance of the asset purchase agreement.  Instead, Pure Barnyard's amended complaint asserts several claims against Results Capital arising out of Webb's misrepresentations, including civil conspiracy, fraud, negligent misrepresentation, and violation of N.H. Rev. Stat. Ann. § 358-A.

## B.   Analysis

Pure Barnyard seeks a default judgment against Results Capital in the amount of "at least $3,500,000."  As just noted,

Pure Barnyard's theory is not that Results Capital's misrepresentations caused the failure of the proposed Pure Barnyard-Organic Labs deal, or that Results Capital is otherwise responsible for that failure.  (The evidence of record, in fact, is that the deal failed because Organic Labs backed out.) Instead, Pure Barnyard's theory is that, in reliance on Webb's representation as to Organic Labs' contract with Cargill for the chicken feather meal product, Pure Barnyard committed to selling that product--rather than its own "Cockadoodle Doo" product--to Home Depot, and that, by the time Pure Barnyard realized the representation was false, it was too late for it to sell "Cockadoodle Doo" to Home Depot or anyone else for that season. Thus, Pure Barnyard argues, the result of the misrepresentations was that Sovereign froze the company's line of credit, leaving it unable to buy the product or the packaging necessary to make any further sales and, as a result, effectively putting the company out of business.

"The party seeking to recover damages has the burden of proving by a preponderance of the evidence the extent and the amount of such damages."  Bailey v. Sommovigo, 137 N.H. 526, 531 (1993).  Under New Hampshire law, a plaintiff can recover only for those injuries proximately caused by the defendant's tortious conduct, and such "conduct is a proximate cause if it is a

substantial factor in bringing about the harm, and if the harm would not have occurred without that conduct." Trull v. Volkswagen of Am., Inc., 145 N.H. 259, 265 (2000). This general rule applies where, as here, the plaintiff claims to have suffered damages as a consequence of the defendant's misrepresentation. See Restatement (Second) of Torts § 549(1)(b) cmt. d (1977) (stating that "indirect or consequential damages resulting from the misrepresentation are recoverable if the misrepresentation is a legal cause of them"). "Causation focuses on the mechanical sequence of events" and "is generally for the trier of fact to resolve." Carignan v. N.H. Int'l Speedway, Inc., 151 N.H. 409, 415 (2004).

Based on Packard's testimony at the damages hearing and the other evidence of record, the court finds that the misrepresentations at issue caused Pure Barnyard to lose the sales that it otherwise would have made to Home Depot (of Pure Barnyard's "Cockadoodle Doo" product) in 2008. It was in reliance on Webb's statements as to Organic Labs's contract with Cargill for large quantities of the chicken feather meal product that Webb offered to sell it, rather than "Cockadoodle Doo," to Home Depot for the 2009 season. In the court's view, Pure Barnyard has also shown by a preponderance of the evidence that, by the time it found out that Webb's representations were false

23

and that those quantities of chicken feather meal would not in fact be available, it could not have simply sold the "Cockadoodle Doo" product to Home Depot instead, at least not for the 2009 season:  among other reasons, Packard testified, Home Depot rejected that solution when he offered it.

The court cannot find, however, that Webb's misrepresentations, or even the sales lost to Home Depot as a result, set in motion a chain of events that culminated in Pure Barnyard's destruction.  While Home Depot accounted for a substantial percentage of Pure Barnyard's sales in 2007, the majority of those sales were to other customers.  Furthermore, at least in the first half of 2008--the only period of time for which Pure Barnyard supplied any detailed financial data--just slightly more than half of its sales came from "Cockadoodle Doo" or any other fertilizer product.  So Pure Barnyard's inability to sell "Cockadoodle Doo" to Home Depot should not have left it unable to sell any product to anyone.

Indeed, rather than trying to link the failure of the entire company directly to the lost Home Depot sales, Pure Barnyard blames its collapse on the cancellation of its line of credit. But Pure Barnyard did not attempt to introduce the testimony of any witness from Sovereign, or even any documents, explaining its decision to cancel the line, and even Packard--who is not

24

competent to testify as to that matter in any event--testified only that Sovereign had done so because Pure Barnyard "could not continue its business" and its "finances couldn't support the line of credit."  But Packard did not convincingly link these problems to Webb's misrepresentations about the availability of the feather meal product or even the sales to Home Depot that Pure Barnyard lost as a result.

The closest he came was his testimony at the hearing that Pure Barnyard "could not continue its business in 2008 and into 2009" because it "had no packaging."  But Packard acknowledged that, had Home Depot agreed in October 2008 to accept "Cockadoodle Doo" in lieu of the promised chicken feather meal product, Pure Barnyard could have filled that order, though "[i]t would have been tight."  Furthermore, Pure Barnyard does not explain why, in reliance on Webb's statements, it would have held off on ordering packaging for its other products--which, again, comprised nearly half of its sales--or, for that matter, for the sales of "Cockadoodle Doo" to customers besides Home Depot.

Moreover, even if Packard's testimony at the hearing could support some plausible theory linking Webb's misrepresentations to Sovereign's cancellation of the line, he articulated a different theory entirely in the affidavit he submitted prior to the hearing in support of the motion for default judgment.

There, Packard stated that "Sovereign called the loan because Pure Barnyard has [*sic*] gone out of business <u>when [Organic Labs]</u> <u>refused to close the consolidation transaction</u>" (emphasis added). The court has little trouble accepting this explanation, which makes much more sense than Packard's subsequent testimony that Sovereign cancelled the line because Pure Barnyard could not order the packaging necessary to sell one of its products, to one of its customers, for 2009.

As already discussed, however, Pure Barnyard has never made a claim in this action against Results Capital arising out of Organic Labs's failure to consummate the deal, and that includes any theory attributing that failure to Webb's misrepresentations about the availability of the feather meal or anything else (a point that Pure Barnyard acknowledged more than once at the damages hearing).  In light of Packard's acknowledgment that Pure Barnyard failed because Organic Labs refused to close on the proposed merger, rather than due to Webb's misrepresentations, it would seem impossible to find that those misrepresentations caused Pure Barnyard to fail.

Accordingly, the court will not award Pure Barnyard any damages against Results Capital beyond the sales of "Cockadoodle Doo" lost to Home Depot in 2008.  While Packard suggested that Webb's misrepresentations had caused Pure Barnyard to lose future

sales to Home Depot as well, there was (as was the case with Sovereign) no testimony by a witness from Home Depot or any other competent evidence suggesting that Home Depot would have refused to buy "Cockadoodle Doo," or any other product, from Pure Barnyard in the future simply because it failed to deliver the promised chicken feather meal product in 2008.  Indeed, while Pure Barnyard continued selling to at least some customers in 2009, 2010, and even 2011, there is no evidence that it even attempted to sell any product to Home Depot in any of those years.  Furthermore, Packard acknowledged an independent reason why Home Depot might have refused to buy "Cockadoodle Doo" from Pure Barnyard:  it was too expensive.  Pure Barnyard has not carried its burden to show that Webb's misrepresentations caused it to lose any business, to Home Depot or any other customer, aside from the expected sales of "Cockadoodle Doo" to Home Depot for the 2009 season (i.e., for product to be ordered in 2008 and delivered early in 2009).

Calculating that number--and the profit that Pure Barnyard lost as a result--is not itself an exercise in certainty, since Pure Barnyard did not introduce any invoices or other evidence of its sales aside from its bare-bones financial statement for the first half of 2008.  "New Hampshire law, however, does not require that damages be calculated with mathematical certainty,

and the method used to compute them need not be more than an approximation." George v. Al Hoyt & Sons, Inc., 162 N.H. 123, 134 (2011).  This approach extends to lost profits, which can be awarded so long as "sufficient data existed indicating that profits were reasonably certain to result."  Id.

In the first half of 2008, Pure Barnyard reported consumer fertilizer sales of $371,854.27.  Packard testified that Home Depot accounted for 40 percent of Pure Barnyard's sales, but did not break that number down specifically by product, so the court will assume that Home Depot accounted for 40 percent of Pure Barnyard's consumer fertilizer sales in the first half of 2008. Packard further testified that Home Depot typically orders fertilizer product in the second half of one year to be delivered in the first half of the next, so the court will assume that Pure Barnyard's reported fertilizer sales for the first half of 2008 reflect the entirety of its sales to Home Depot for product it ordered in 2007.

Based on these assumptions, which the court considers reasonable, Pure Barnyard would have sold $148,741.71 in "Cockadoodle Doo" fertilizer to Home Depot for the 2009 season, i.e., in the second half of 2008, but for Webb's misrepresentations.  Buying that fertilizer would have cost Pure Barnyard $69,732.70, at least at the 2008 levels, and there is no

28

reason to believe the cost would have risen.  Sufficient data exist to say with the requisite degree of certainty that losing sales of "Cockadoodle Doo" to Home Depot for the 2009 selling season cost Pure Barnyard $79,009.01 in profits.  The court will therefore award damages to Pure Barnyard in that amount.[4]

## III. <u>Conclusion</u>

For the foregoing reasons, Results Capital's motion to strike its default[5] is DENIED and Pure Barnyard's motion for default judgment[6] is GRANTED in part.  The Clerk shall enter judgment for Pure Barnyard and against Results Capital in the sum of $79,009.01 and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  September 26, 2012

---

[4]While Pure Barnyard's amended complaint sought treble damages under § 358-A, Pure Barnyard did not so much as make reference to that relief in either its motion for default judgment or Packard's supporting affidavit nor, for that matter, at any time during the hearing.  So the court considers that claim waived.

[5]Document no. 109.

[6]Document no. 104.

29

cc:  Mark F. Weaver, Esq.
     Edmond J. Ford, Esq.
     William S. Gannon, Esq.
     Robert H. Miller, Esq.
     Christopher Cole, Esq.
     Courtney H.G. Herz, Esq.
     Christopher H.M. Carter, Esq.